**Charles MERRIWEATHER, et al., Plaintiffs and Plaintiff-Intervenors,**

v.

**Wilbur K. SHERWOOD, et al., Defendants.**

**No. 77 Civ. 3421.**

United States District Court, S. D. New York.

July 21, 1981.

Farmworker Legal Services of New York, Inc., Riverhead, N. Y., for plaintiffs and plaintiff-intervenors; Anthony Szczygiel, Colden, N. Y., of counsel.

James G. Sweeney, County Atty., Goshen, N. Y., for defendants.

## OPINION

EDWARD WEINFELD, District Judge.

This class action centered about conditions of confinement at the Orange County

Jail ("OCJ") in Goshen, New York. The complaint sought to secure better medical and mental health care at the facility, as well as improved living conditions in the form of recreational, educational and other out-of-cell and out-of-tier activities. After lengthy negotiations, during which the attorneys for both parties displayed a highly commendable flexibility and spirit of cooperation, a compromise was reached. A consent judgment was entered on October 27, 1978. A plan for implementing the consent judgment, which had been required by the judgment, was completed and agreed to by the parties on November 30, 1978. Defendants now move pursuant to Rule 60(b)(5) and (6) of the Federal Rules of Civil Procedure to relieve themselves of the requirements of portions of this judgment and plan addressed to a dining hall arrangement at the OCJ.

Although the broad-based complaint did not specifically refer to the lack of a dining or mess hall facility at the OCJ, provisions for such a facility were made in both the consent judgment and plan. As part of a provision to combat enforced idleness,[1] the consent judgment required defendants "to provide all OCJ prisoners with a reasonable amount of movement daily from place to place."[2] Pursuant to this provision, the consent judgment required drafting of a plan to include at minimum a "[p]rovision for a mess hall where all prisoners may take all their meals (except for ill prisoners confined to bed)."[3]

The implementing plan described the proposed mess hall in greater detail. The plan included a floor plan designed by defendants' architect of a so-called "multi-purpose room," a corner of which housed nine retractable tables and accompanying benches to seat 126 inmates. A rolling partition divided the room, which doubled as a gymnasium.

During the negotiations, concern had been raised over the legality of the proposed mess hall arrangement under § 500–c of the New York Correction Law. Section 500–c, entitled "Custody and control of prisoners," distinguishes twelve classes of prisoners, the commingling of which is prohibited except for "educational, vocational and divine worship programs conducted within the jail."[4] The prisoner classes distinguish between males and females, youths and adults, and those awaiting trial, those convicted, and those in custody on civil process, committed for contempt or detained as witnesses.[5] The parties requested the advice of the counsel to the State Commission of Correction on this issue, who opined that the proposed dining arrangement arguably adheres to the legislative intent behind § 500–c so long as specified conditions are maintained, namely, that prisoners are kept under constant and close supervision and that different classes of prisoners who are in the dining area at one time are appropriately separated so that they are not allowed to talk or be in close proximity to one another. This opinion was attached as an exhibit to the implementing plan. Based on this opinion, both parties were under the impression when signing the consent judgment and plan that the mess hall provision was legal.

Following entry of the consent judgment and plan, defendants commenced construction of the contemplated multi-purpose room, which now has been completed and currently is used as a gymnasium but has yet to be employed as a mess hall. On March 10, 1980, a new Corrections Administrator was appointed at the OCJ. Upon familiarizing himself with the consent judgment and plan and the opinion of counsel to the Correction Commission, as well as personally examining the completed multi-purpose room, the Administrator expressed serious concern over the legality and safety of

---

1. The remaining elements of the enforced-idleness provision are not here at issue.

2. Consent Judgment at 28.

3. *Id.*

4. N.Y. Correction Law § 500–c (McKinney Supp.1980).

5. *See also* 9 N.Y.C.R.R. § 7013.1.

using the multi-purpose room as a mess hall. The Administrator was of the view that § 500–c was straightforward in requiring complete separation of inmate classes during dining. Given that the OCJ normally contains eight or nine of the twelve classes of prisoners at any one time,[6] and assuming that meal-time activity for each class would take approximately one-half hour, the Administrator estimated that feeding prisoners in the new mess hall would require up to four and one-half hours per meal or a total of thirteen and one-half hours per day, not including time required for movement of prisoners, clean up, and correctional staff meal activity. This "round-the-clock feeding operation," the Administrator contended, would overburden OCJ's available staff and render impossible the intended second use of the multi-purpose room as a gymnasium.

The Administrator also voiced concern over the security of the proposed mess hall. He noted that the large volume of the multi-purpose room, over 25,000 cubic feet, would require huge quantities of "CN gas," the means commonly employed to quell inmate disturbances, to effectively arrest any such uprising that might occur. Large quantities of CN gas, he claimed, can be lethal. He also noted that the frequent movement of the inmate population that would be required by the necessary dining schedule would "severely jeopardize[ ]" the security of the entire jail.

Based on these newly raised concerns over the legality and safety of the mess hall proposal, defendants brought the instant motion, initially returnable on January 6, 1981, to relieve themselves from the requirements of the consent decree directed toward maintenance of a mess hall facility. Since defendants considered these matters resolved until the new Administrator arrived on the scene, the motion was brought "within a reasonable time" as required by Rule 60(b)(5) and (6). In place of the mess

hall arrangement, defendants propose continuing the existing system of feeding inmates on their tiers. These tiers, of which there are eight in the OCJ, consist of long, narrow exercise corridors, $7' \times 100'$, connecting the seventeen cells on the tier, with small, two-seat tables and benches permanently attached to the corridor walls. Under this arrangement, inmates are free to dine with up to sixteen other inmates also on their tier, but cannot mingle with the jail population at large or leave their immediate cell areas.

In an initial effort to determine the legality of the proposed mess hall arrangement under § 500–c, the Court directed the parties to obtain the opinion of the Attorney General of the State of New York. The Attorney General, in an informal opinion, interpreted the inmate classification requirements of § 500–c as serving the dual purpose of facilitating treatment of inmates and maintaining prison security:

> Through the segregation of classes of prisoners, security in housing and programs can be tailored to meet the escape and violence threats posed by the members of each class. Segregation of classes can also be used as a treatment tool to insulate the potentially harmful influence of a hardened criminal from, for example, a minor or a person being detained for trial, or a person being held in relation to a civil matter. Treatment technique can then be tailored to the needs of each class.[7]

In light of these purposes of § 500–c, the Attorney General concluded that the legality of the proposed mess hall arrangement was a "question of fact":

> Depending on the physical characteristics of the mess hall, there may be options for separation of prisoner classes that will permit communal dining consistent with treatment and security goals, and, therefore, in compliance with the apparent legislative intent of section 500–c.[8]

---

6. Plaintiffs contend that nine classifications are the maximum ever present and that the actual average is 7.6.

7. Informal Opinion No. 81–54, at 3 (Apr. 9, 1981).

8. *Id.*

Several possibilities for complying with § 500–c were then suggested, including the use of movable partitions to separate classes, provision of separate avenues of ingress and egress, and prohibition of communication between classes, so long as sufficient guards were employed in each of these situations to meet the threats posed by each prisoner class.

The inconclusiveness of the Attorney General's opinion left the issues underlying the instant motion essentially unresolved. The parties, despite their laudable record of cooperation, still were unable to agree on an appropriate mess hall plan. Accordingly, a hearing was held and testimony was heard.

Defendants called as witnesses several prison officials from other jails as well as personnel from the OCJ. These witnesses reiterated the concerns already expressed by the new OCJ Administrator in addition to raising other dangers associated with the proposed mess hall facility. They noted that the large size of the multi-purpose room made it difficult to guard, that the flimsily constructed retractable tables and benches lent themselves too readily to use as weapons or battering rams, and that the extra movement required to transport prisoners between their tiers and the multi-purpose room invited violent incidents. It was also reaffirmed that the time required to transport and feed each prisoner class separately coupled with that needed for routine security precautions would significantly reduce the time and staff available for other inmate activities. Uniformly, defendants' witnesses concluded that use of the multi-purpose room as a dining facility substantially increased security risks and was not consonant with sound jail administration or with the best interests of the inmates.

Plaintiffs sought to attack both defendants' conclusions concerning the danger of the mess hall arrangement and their proposed alternative, on-tier dining. One of plaintiffs' witnesses, a former warden with the New York City prison system, while recognizing the danger implicit in a mess hall setting or in movement to and from it, argued that keeping prisoners under lock and key would create even greater prob-

lems and potential for violence. The gist of his testimony was that the dangers associated with the contemplated mess hall arrangement were necessary but controllable evils.

A second of plaintiffs' witnesses, an architect specializing in prison design, criticized defendants' proposal to continue feeding prisoners on their tiers. He likened the tiers to mere corridors, unfit for "civilized eating" and aesthetically unpleasing, and criticized the built-in tables-for-two as cramped. He recommended decentralized dining areas or day rooms with more regular dimensions than the tiers, as he claimed is preferred by contemporary correctional standards. Notably, however, this witness was highly critical of the multi-purpose room design and of its use as a mess hall. The witness not only found the room inappropriate as a gymnasium (he felt the room was designed more for a high school of 2000 students than for a small jail setting); he agreed with defendants that it was not physically possible to maintain visual or accoustical separation of various classifications of prisoners using the room at the same time. The sole method for salvaging the room as a dining facility that he could see was to divide it into a series of little rooms, a solution that would destroy its use for recreational purposes.

Based on this testimony, plaintiffs suggested several alternatives to the proposed mess hall plan, including use of the multi-purpose room for at least some classes of inmates, use of other rooms in the jail for inmate dining, and construction of new day rooms adjacent to the tiers. They, however, opposed defendants' proposal of continuing on-tier dining.

■ After a careful consideration of the testimony, the Court is of the view that defendants are entitled to be relieved from the mess hall requirements of the consent judgment and plan. The multi-purpose room as contemplated by the parties was ill-advised and ill-planned as a dining facility, and was based on a mistaken perception of the requirements of New York State law. The size of the room and the extra movement of prisoners that its use as a

dining facility would entail pose serious security problems at an institution like the OCJ that would endanger both prison staff and inmates. Moreover, use of the multipurpose room as a mess hall in conformance with the classification requirements of § 500–c would be impractical in terms of the time and personnel required and would require substantial expense. Accordingly, the mess hall requirements of the consent judgment and plan are stricken.

■ Furthermore, defendants are permitted to continue the current method of feeding prisoners on their tiers. While the use of decentralized day rooms or other locations for dining may be aesthetically more pleasing and more in accord with contemporary correctional standards, as plaintiffs contend, defendants are not required to provide inmates with an ideal or pleasing correctional environment, so long as prison conditions conform with constitutional standards.[9] As the Supreme Court recently observed:

> [C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.[10]

Similarly, in addressing the rights of pretrial detainees, the Supreme Court noted:

> Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.[11]

Requiring inmates to dine in their tiers does not even approximate a deprivation of constitutional magnitude. The existing dining facilities are neither harsh nor restrictive. There is no evidence that such dining "either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment."[12] Nor is there any indication that such dining was "imposed for the purpose of punishment."[13] On the contrary, the use of on-tier dining facilities is reasonably related to the legitimate governmental interests in maintaining security and ensuring compliance with New York law. Accordingly, since on-tier dining is neither "punishment" nor "cruel and unusual punishment,"[14] the defendants should not be burdened with the considerable expense of constructing decentralized day rooms or staffing the other dining alternatives that plaintiffs recommend. Defendants' motion is granted.

So ordered.

---

**9.** *Rhodes v. Chapman,* —— U.S. ——, 101 S.Ct. 2392, 2400–2401, 69 L.Ed.2d 59 (1981).

**10.** *Id.* —— U.S. at ——, 101 S.Ct. at 2399.

**11.** *Bell v. Wolfish,* 441 U.S. 520, 540, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979).

**12.** *Rhodes v. Chapman,* —— U.S. ——, ——, 101 S.Ct. 2392, 2999, 69 L.Ed.2d 59 (1981) (footnote omitted); *see Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570–2571, 57 L.Ed.2d 522 (1978); *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

**13.** *Bell v. Wolfish,* 441 U.S. 520, 538, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979).

**14.** *Lareau v. Manson,* 651 F.2d 96 (2d Cir. 1981).