Lurana M. BERWEGER and Susan E. Menon, Plaintiffs,

v.

COUNTY OF ORANGE, Joseph G. Rampe, County Executive, Chris Ashman, Commissioner of Mental Health, Richard Golden, County Attorney, and Eastern Healthcare Group, Inc. Defendants.

No. 99 Civ. 4717(CM).

United States District Court, S.D. New York.

Nov. 8, 2000.

Helen G. Ullrich, Goshen, NY, for Lurana M. Berweger, Susan E. Menon.

Kevin Francis Preston, Mac Vean, Lewis, Sherwin & McDermott, P.C. Middletown, NY, for County of Orange.

Joseph A. Catania, Drake Sommers, Loeb Tarshis & Catania, Newburgh, NY, for Joseph G. Rampe, Chris Ashman, Richard Golden.

Jacqueline Ricciani, Greenwald Law Offices, Chester, NY, for Eastern Healthcare.

## MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT AS TO DEFENDANTS ASHMAN AND GOLDEN, AND DENYING SUMMARY JUDGMENT AS TO DEFENDANTS RAMPE, THE EASTERN HEALTHCARE GROUP, AND THE COUNTY OF ORANGE.

McMAHON, District Judge.

Plaintiffs Lurana M. Berweger and Susan E. Menon are medical services workers. They allege that they were fired from their jobs at the Orange County Correctional Facility ("the Jail") for criticizing the County's Department of Mental Health, in violation of their civil rights under 42 U.S.C. § 1983. They also have joined a state claim under the Whistleblower Statute, New York State Labor Law § 740. They bring their claims against the County of Orange ("the County"); Joseph G. Rampe, County Executive, Chris Ashman, Commissioner of Mental Health, and Richard Golden, County Attorney ("the Individual County Defendants"); and Eastern Health Care Group, Inc. ("EHG").

On November 12, 1999, this Court dismissed Menon's claims against defendant EHG. Menon remains a plaintiff in this case against the County and the County Defendants. On March 27, 2000, the plaintiffs discontinued their claims against the Individual County Defendants under New York State Labor Law § 740.

All defendants have moved for summary judgment on the claims that remain against them.

The County has moved for summary judgment on three grounds: (1) that plaintiffs have not offered evidence that presents a genuine issue of material fact as to whether the County Defendants coerced EHG to terminate them; (2) that plaintiffs

have not offered evidence that presents a genuine issue of material fact that the County Defendants conspired to deprive them of employment; and (3) that plaintiffs fail to state a claim under the New York Whistleblower Law.

The Individual County Defendants moved for summary judgment on the ground that there is no evidence that any county official coerced EHG to terminate the plaintiffs or to prevent their successor from hiring them.

EHG moved for summary judgment on the grounds that (1) EHG did not act under color of state law; and (2) plaintiff cannot create a genuine issue of material fact under the New York Whistleblower Law. EHG also moved for attorneys' fees as the prevailing party on their motion to dismiss plaintiff Menon's claim against it, and for sanctions under Rule 11 of the Federal Rules of Civil Procedure.

For the reasons stated below, summary judgment is granted as to defendants Ashman and Golden, and denied as to Rampe, EHG and the County on the 1983 claims; summary judgment is granted to all remaining defendants on the claims arising under the New York Whistleblower Statute; and EHG's motion for sanctions and fees is denied.

## FACTS PERTINENT TO THE MOTION

On a motion for summary judgment, the Court views the facts most favorably to the non-moving party—in this case, the plaintiffs.

### 1. Medical Care at the Orange County Jail

The County operates the Jail in Goshen, New York. It contracts with private entities to provide medical services to inmates. The County Executive, Joseph Rampe, has the power to award and terminate the contracts. (Rampe Dep. at 33–34.)

From approximately 1987 to 1989, the County contracted with Correctional Medi-

cal Services ("CMS") to perform medical services, and from approximately 1994 to 1998 with Correctional Physicians Services ("CPS"). On April 1, 1998, the County contracted with Eastern Healthcare Group ("EHG") to assume the provision of medical services.

Plaintiffs Menon and Berweger are registered nurses. They have worked for all three private contractors who provided medical services to inmates at the Goshen Jail. Menon was hired at the Jail as Health Services Administrator ("HSA") in 1986, supervising the medical unit nursing staff. Although the medical services contractor changed periodically, Menon remained in her position until 1997, when she was promoted to Regional Manager. At that time, Berweger, who had been a nurse on staff at the jail since 1990, became the HSA.

The Orange County Department of Mental Health (DMH) under its Commissioner, Chris Ashman, provides mental health and psychiatric services at the jail. DMH employed a psychiatrist to prescribe psychiatric medications, but the nursing staff employed by the vendor would only administer such prescriptions upon written order from the psychiatrist with designated privileges at the jail.

### 2. Complaints by Plaintiffs About Medical Care at the Jail

Commencing in or about 1994 and continuing through 1998, Menon complained to Ashman and to Colonel Theodore Catletti, Correctional Administrator, that the nurses providing care to inmates were unable to reach the DMH psychiatrist Beneb Ting, M.D., when needed. Until 1994, Dr. Ting had made his telephone number available to nurses so that they could call him in an emergency, or with questions about inmate psychiatric care. According to Menon, Dr. Ting ceased responding to nursing staff phone calls in or about 1994, and began leaving Orange County for long periods of time without notifying the nurses.

When Menon complained to Ashman about Dr. Ting's failure to provide services to inmates, he told her to use the "back-up unit" at Arden Hill Hospital ("AHH"). However, because the physicians at AHH did not have privileges to prescribe medications for inmates as required by administrative standards, Dr. Ting's authorization was still necessary to administer medication to inmates.

Menon also complained to Ashman that Dr. Ting was over-prescribing psychotropic medications to inmates; that the DMH staff was failing to verify inmates' medication history prior to prescribing psychotropic drugs; and that DMH had failed to make adequate provision for emergency psychiatric care for inmates. (Menon Dep. at 75–107, Catletti Dep. at 31–48). In 1995, Menon complained to Ashman that the DMH was not verifying inmates' claims about the medications they had been taking prior to incarceration. Menon alleges that Ashman did not take any corrective action.

When Berweger became HSA in 1997, she made similar complaints about DMH to Ken Fox, Deputy Commissioner of Mental Health. (Berweger Dep. at 174, 26–28.)

In or about March 1998, the nursing staff sent a female inmate to the emergency room at AHH because she was lying on the floor, unresponsive. The inmate was a patient of the DMH. She was diagnosed with tranquilizer poisoning and a drug overdose, as a result of over-medication by DMH. Berweger reported this incident to Keith McLean, vice-president and chief operating officer of EHG. Berweger and Menon also shared with McLean their general concerns about DMH services at the Jail.

In early June, 1998, Berweger suggested to McLean that they report their concerns about the DMH to a higher authority. (Berweger Dep. at 49.) After some consideration, McLean gave Berweger permission to write a letter on EHG stationery to Rampe. (Id.) In her letter, dated June 22, 1998, Berweger told Rampe about the problems the medical unit had experienced from 1995 to 1998 concerning DMH services. She cited the case of the inmate with tranquilizer poisoning, and explained how she had sent the bill for the inmate to Ashman for payment. She wrote that "Mr. Ashman sent a terse letter...feigning ignorance as to why the bill was sent to him even though he was apprised of the situation in writing..." (Ex. 2 to Ullrich Aff.) Berweger concluded:

> "The situation as it exists cannot continue. We need to be one department with the same philosophies and 24 hour access to physicians and psychiatrists that all have the same employer so we can freely exchange information and ideas.
>
> "It is my hope that you will consider a change at the jail and you will entertain a proposal to privatize the services of the mental health department so that the medical department and the mental health department can work together professionally to deliver quality care to the inmates of Orange County."

(Id.)

After Rampe received the letter, Catletti called Berweger to his office. He told her that Rampe was "furious" that she had criticized Ashman. (Berweger Dep. at 39, 219.) Rampe made no attempt to contact Berweger in response to her letter, and refused to speak to McLean about it. (Rampe Dep. at 82.)

On or about July 8, 1998, upon McLean's order, Berweger prepared a document detailing all of the "concerns" that the jail's Medical Department had with DMH. On or about July 9, 1998, Menon delivered this document to Gary Greenwald, Esq., attorney for defendant EHG and to Spencer McLaughlin, an Orange County Legislator.

Menon also met with McLaughlin to discuss problems at DMH on that same day. (Menon Dep. at 246–248.) As a result, McLaughlin phoned and met with Ashman concerning Menon's complaint, as did another legislator, Bernard Winstanley,

Chairman of the Mental Health Committee. (Ashman Dep. at 105–110.)

### 3. *EHG's Contract Endangered*

At the end of April, 1998, a local newspaper article had revealed that McLean had been fired as the Jail's administrator thirteen years earlier amidst allegations that he abused privileges and mishandled finances. *See* Christopher Mele, *Fired Jail Administrator is Back as Contractor, The Times Herald–Record,* Apr. 30, 1998 at 9. Defendants contend that after reading the newspaper article, County Executive Joseph Rampe told County Attorney Richard Golden that he wanted to re-bid the contract for medical services at the jail because he was concerned about the connection with Keith McLean. (Rampe Dep. at 51.) In a memo dated May 12, 1998, Rampe asked Orange County Sheriff Frank Bigger for a complete list of staff employed by EHG, as well as the staff members who had worked for the previous medical contractor. (Ex. 4 to Ullrich Aff., Rampe Dep. at 47–48.) Rampe also directed Golden to contact AHH to see if they were interested in providing medical services to the county jail. (Id.) There are no records to support Rampe's claim that he reached out to AHH.

Rampe claimed that he also wanted to avoid billing problems that had occurred under prior administrators in the Jail. (Rampe Dep. at 47–48.)

Rampe did not call either Catletti or Bigger about the article after it appeared, (Bigger Dep. at 23, Catletti Dep. at 76), nor did he issue any statement to the news media. Neither Rampe nor Golden advised Bigger or Catletti that Rampe wanted the contract rebid. (Bigger Dep. at 51–52.)

The contract between EHG and the County has a termination clause that permits the contract to be terminated without notice and without reason, at the convenience of the County. McLean became concerned that EHG's contract could be in jeopardy because of Berweger's letter to Rampe. (McLean Dep. at 82.) However, McLean allegedly told Berweger that she was a hero and that she had saved his contract because the letter she had written to Rampe protected her as a whistleblower. (Berweger Dep. 80/5–21.)

### 4. *Plaintiffs Are Fired*

On the morning of July 17, 1998, McLean told Menon and Berweger that they were to attend a meeting that afternoon in Sheriff Bigger's office to discuss the problems. Referring to plaintiffs' criticisms of DMH, McLean promised them that he and Ashman had "worked it all out." (Menon Dep. at 253–256.) He explained that as a result of his conversation with Ashman, Dr. Ting would wear a beeper and be available in emergencies, and that eventually he would be fired.

When Menon asked how he was able to get Ashman to agree to changes after she had been unsuccessful, McLean allegedly said: "Chris and I go back a long way and I have a rapport with him..." (Berweger Dep. at 86.) Ashman and McLean first met in 1981 when McLean was the jail administrator and Ashman was the supervisor of the DMH Forensic Clinic at the jail. (Ashman Dep. at 6 .) Over the years, Ashman and McLean continued to exchange "administrator-to-administrator perspectives" via telephone. (Id. at 113.)

Plaintiffs allege that at the afternoon meeting, Ashman was overtly hostile to Berweger. Ashman complained that he had come to the meeting but all he was hearing was the "same old stuff." (Berweger Dep. at 97.) By the end of the meeting, none of McLean's earlier predictions had come to pass. Berweger asked him why he had given them false assurances that morning (Id. at 99.), and McLean allegedly replied, "I did what I had to do to save my contract." (Id.)

On or about July 21, 1998, Ashman accused Berweger of improper behavior in the conduct of her duties. Berweger alleges that these were false accusations, and

that she responded to them to McLean's satisfaction.

McLean, Berweger and Menon were on vacation until mid-August. After they returned on August 13, 1998, Menon and Berweger were told to report to the Greenwald Law Office the following morning at 9:30 and 10:00 a.m. (Berweger Dep. at 135.) When Menon arrived at 9:30, she met with McLean, who told her that because she had made derogatory statements about EHG to Bigger, she could either resign or be terminated. (Menon Dep. at 306–308.) When she asked what statements he was referring to, McLean told her they were confidential. (Id.) McLean testifies in this action that he fired Menon because she had ignored his instructions to meet with Warden Hutler to conduct an audit exit interview for the HSA (McLean Dep. 39); had written an improper letter to EHG's insurance carrier expressing concern about the way they were notifying vendors and setting up contracts (Id. at 43); and had been unreachable at a time she was supposed to cover the jail in Berweger's absence (Id. at 46).

In his meeting with Berweger, McLean said: "Lurana, while you were away and I was away, things were said, and due to basic philosophical differences, I will no longer need your services at Eastern Healthcare Group." (Berweger Dep. at 137–140.) McLean did not explain to Berweger what "things were said," but claims that she was fired for taking off two weeks of vacation without having accrued enough time. (McLean Dep. at 100.) He calculated the accrual statistics on the morning of August 14, 1998, and explains that he merely intended to speak with Berweger about the problem. McLean contends that he fired her only after she refused to discuss the issue with him. (Id. at 101.) However, he had already interviewed a candidate for Berweger's job prior to firing her. (Id. at 99.)

During their employment by EHG, McLean never criticized either of the plaintiffs' job performance or conduct. (Bigger Dep. at 28, Catletti Dep. at 85–86.)

Both Rampe and Ashman testified in their depositions that they never suggested to McLean, or any other EHG employee, that Menon or Berweger's employment be terminated. (Rampe Dep. at 86–8; Ashman Dep. at 150.) Plaintiffs allege that McLean fired Berweger and Menon in exchange for Ashman's intervening with Rampe to save EHG's contract with the County, but they have no direct evidence to contradict Rampe's and Ashman's testimony.

Plaintiffs contend that in or about fall 1998, Bigger advised them that he wanted to terminate EHG's contract, and that he would cause a new vendor to re-employ them. In or about April 1999, the County terminated EHG's contract to provide medical services to the jail, and awarded a new contract to Correctional Medical Services, Inc. ("CMS"). Plaintiffs allege that CMS offered both Berweger and Menon their former positions at the jail.

On or about April 26, 1999, Richard Golden, the County Attorney for the County of Orange, advised agents of CMS that, on orders of Rampe, CMS could not hire Menon or Berweger to work in the jail. When Golden, Bigger and Catletti met with CMS representatives to discuss clarification of issues relating to the contract, Golden advised CMS' representatives that no member of a prior administration could be hired. (Catletti Dep. at 116.) Catletti asked Golden: "Are we talking about Sue Menon and Lurana Berweger?" (Id.) Golden replied: "Yes we are ... this is what the County Exec wants...." (Id.) At a subsequent meeting with Golden, a CMS representative again raised the issue of hiring Menon and Berweger. Golden reaffirmed Rampe's prohibition. (Id. at 120.)

## DISCUSSION

1. *Defendants' Motion for Summary Judgment on the § 1983 Claim*

Summary judgment is granted as to defendants Ashman and Golden, and denied as to Rampe, EHG and the County.

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505. While Plaintiffs need not produce direct evidence of an alleged civil rights violation, they must be able to produce evidence, in admissible form, that is more than surmise and speculation which is based on their own subjective beliefs. *See Matsushita*, 475 U.S. at 576, 106 S.Ct. 1348.

### a. *Rampe*

 Plaintiffs have offered sufficient evidence to create a genuine issue of material fact as to Rampe's participation in the decision to fire them. Rampe asserts that his interest in terminating EHG's contract stems back to the April 30, 1998 article that called into question McLean's character. After reading the article, he claims to have asked Golden to pursue a contract with AHH to replace EHG. The plaintiffs allege that the absence of any record of such pursuits suggests that no contact was ever made at that time. They further argue that Rampe first wanted to terminate EHG's contract when he received Berweger's June 22, 1998 letter on EHG stationery and decided to punish them for criticizing Ashman. The evidence suggests that the letter, which was critical of Ashman, made him "furious." (Berweger Dep. at 39, 219.) Further, when negotiating the new contract with CMS, Rampe ordered that no member of a prior administration could be hired. (Catletti Dep. at 116.) At the meeting, Golden confirmed that Rampe was referring to Menon and Berweger when he made that order. In view of this, whether Rampe was involved in terminating plaintiffs' employment is a factual question to be resolved by a jury.

Rampe has the ultimate authority to sign contracts for the County. A reasonable juror could infer from Rampe's refusal to allow the plaintiffs to be rehired that he participated in getting them fired in the first place. Because Rampe's actual involvement in the plaintiffs' termination raises a question of fact for the jury, his motion for summary judgment is denied.

### b. *Golden*

 Plaintiffs have not presented a scintilla of evidence to suggest that County Attorney Golden was part of a conspiracy to punish them for their speech. On the record before me, Golden's only involvement with this matter occurred in the context of serving as Rampe's messenger. After Berweger and Menon were terminated, Golden relayed the message from Rampe that CMS could not re-hire them. Assuming all facts to be true, there is insufficient evidence from which a jury could conclude that Golden was responsible for EHG's decision to fire the plaintiffs. His motion for summary judgment is therefore granted.

### c. *Ashman*

 Plaintiffs similarly have presented no evidence that Ashman was part of a conspiracy to punish them for their speech. Ashman was the subject of criticism by the

plaintiffs about the DMH. Plaintiffs point to Ashman's relationship with McLean and Rampe, and allege that he protected EHG's contract with the County in exchange for McLean's discharging Berweger and Menon. These statements, however, are conclusory and speculative, with no evidentiary support. *See Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505. Indeed, the evidence contradicts plaintiffs' speculation, as McLean/EHG lost its contract.

Plaintiffs also have not alleged that Ashman's position as Commissioner of Mental Health gave him any legal authority to independently make employment decisions on behalf of the County, and they offer no evidence that he participated in the decision to fire them. While plaintiffs in a civil rights action face some difficulties in obtaining evidence, *see Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir.1989) ("In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a personnel file' that their actions are motivated by factors expressly forbidden by law."), the plaintiffs here have failed to provide any evidence to support a claim against Ashman. His motion for summary judgment is therefore granted.

d. *EHG*

■ In order to prevail in any claim against EHG under § 1983, plaintiff must first show that EHG, a private party, was "acting under color of state law" at the time it allegedly violated the plaintiff's constitutional rights by firing them for engaging in protective speech. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Sherlock v. Montefiore Med. Ctr.,* 84 F.3d 522, 527 (2d Cir.1996). A private individual can be held liable under § 1983 "only as a 'willful participant in joint activity with the State or its agents.'" *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.) (quoting *Adickes v. S.H.*

*Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), *cert. denied,* 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992). "Actions by a private party are deemed state action if 'there is a sufficiently close nexus between the State and the challenged action' that the actions by the private parties 'may be fairly treated as that of the State itself.'" *Chan v. City of New York,* 1 F.3d 96, 106 (2d Cir.) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)), *cert. denied sub nom. City of New York v. Kam Shing Chan,* 510 U.S. 978, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993). "The purpose of [the close-nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Id.* (emphasis in original) (citations omitted).

■ The Supreme Court has established three tests to determine whether a private person is deemed to be a "state actor" for purposes of § 1983:(1) the public function test, *see Atkins,* 487 U.S. at 49–50, 108 S.Ct. 2250; (2) the state compulsion test, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); and (3) the symbiotic relationship or nexus test, *see Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Plaintiff Berweger alleges that EHG was a state actor under the state compulsion and symbiotic relationship tests.

■ To prevail under the "state compulsion" test, plaintiff must show that the state actor "exercised coercive power or ... provides such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In *Adickes,* the plaintiff was a white teacher who was refused lunch at a Kress store in Hattiesburg, Mississippi with her African–American students, and then arrested when she left the store. She

alleged that there was a conspiracy between the store owner and the police to deprive her of her Equal Protection Rights under the Fourteenth Amendment, and sued under Section 1983. The Supreme Court reversed the lower courts' grant of summary judgment to the defendants. The Court reasoned that, while the plaintiff had no direct knowledge of a conspiracy between Kress and the Hattiesburg police, "the sequence of events created a substantial enough possibility of a conspiracy to allow her to proceed to trial, especially given the fact that the non-circumstantial evidence of the conspiracy could only come from adverse witnesses." 398 U.S. at 157, 90 S.Ct. 1598.

■ In the present case, the plaintiffs do not have actual knowledge of steps defendant Rampe, or any of the County Defendants, may have taken to deprive them of their employment in retaliation for their exercise of protected speech. They can, however, point to a sequence of events evidencing such a conspiracy, sufficient to allow a jury to decide whether EHG was a state actor when it fired plaintiffs. Rampe may have begun to take an interest in EHG's contract after plaintiffs criticized Ashman and DMH; he asked to see records of individuals who had worked for EHG; and he personally intervened to prevent them from being re-hired by EHG's successor (though they had worked for EHG's predecessor). The record reflects that he was angry about Berweger's criticism. The fact that plaintiffs were not fired for poor performance (and had never been criticized for same); that McLean was unable to explain what criticism Menon had allegedly leveled at EHG or what "was said" in Berweger's absence; that he had concern about his contract; and Rampe's singular power over that contract—all of this taken together-would permit a jury to infer that Rampe had something to do with firing the plaintiffs. And if Rampe were so involved, the decision by EHG to fire the plaintiffs as a matter of law could fairly be attributed to the state

under the "state compulsion" test. *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777.

■ To prevail under the "symbiotic relationship" or close nexus test, plaintiff must show that "[t]he State has so far insinuated itself into a position of interdependence with [EHG] ... that it must be recognized as a joint participant in the challenged activity." *Burton*, 365 U.S. at 725, 81 S.Ct. 856. EHG is an independent contractor, providing medical care to inmates at the Jail. Plaintiffs must show that the state was, through the interdependence of EHG and the County, a "joint participant" in the activities being challenged—i.e., McLean's decision to fire them.

Plaintiff distinguishes *Sherlock v. Montefiore*, 84 F.3d 522 (2d Cir.1996), a case that did not find an independent contractor to be a state actor. In *Sherlock*, the Second Circuit affirmed the district court's grant of summary judgment for the defendant on the grounds that the plaintiff had failed to allege "state action" by a state contractor. 84 F.3d at 527. There, the defendant was an independent contractor providing medical services at the Rikers Island Correctional Facility that had hired the plaintiff to provide counseling services. The plaintiff sued under § 1983 for wrongful termination. In holding that the plaintiff's claim was properly dismissed for failing to allege state action, the Second Circuit noted:

> The fact that a municipality is responsible for providing medical attention to persons held in its custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 with respect to the services so provided, *see, e.g., West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), but that fact does not make the contractor a state actor with respect to its employment decisions, *see, e.g., Rendell–Baker v. Kohn*, 457 U.S. 830, 840–43, 102 S.Ct. 2764, 73 L.Ed.2d 418

(1982); *Wolotsky v. Huhn,* 960 F.2d 1331, 1335–36 (6th Cir.1992).

*Sherlock,* 84 F.3d at 527.

*Sherlock* is distinguishable from the present case. In *Sherlock,* there was no evidence of state involvement in the decision to fire the plaintiff. Here, however, there is some evidence that Rampe was, in fact, involved with EHG's decision to fire plaintiffs. The issue is best left to a jury.

### e. *County of Orange*

▮ To recover against a municipality in a Section 1983 action, the plaintiff must establish that (1) the municipality had a policy or custom that was responsible for the alleged deprivation of constitutional rights, or (2) that a failure of supervision or lack of training is "so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of plaintiff's constitutional rights." *Monell v. Dept. of Social Servs. of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs have not alleged that Orange County or EHG maintained a policy of firing employees for their critical speech. Thus, under *Monell,* it would appear that the plaintiffs cannot make out a claim against the County.

▮ However, municipal liability may also be imposed where a final policymaker of the municipality is personally responsible for the constitutional violation. *See McMillian v. Monroe County,* 520 U.S. 781, 784–86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). A final policymaker is an official of a municipality who "speak[s] with final policymaking authority" for the municipality "in a particular area, or on a particular issue." *Id.* at 785, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1. The question of who qualifies as a final policymaker is one of state law. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

The *Praprotnik* Court noted that States have extremely wide latitude in determining the form that local government takes. *See id.* at 925. It concluded that "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.*

▮ The New York Alternative County Gov't Law § 155 grants broad powers and duties to a County Executive. It provides, in relevant part: "The county executive, except as otherwise provided by this chapter or by other law, shall: (a) Be the administrative head of the county government; (b) Have supervision, direction and control over governmental functions of all administrative units of the county ..." N.Y. Alt. County Gov't § 155. The Orange County Charter grants to the County Executive "all executive powers and duties now or hereafter conferred or imposed upon him...together with all powers and duties necessarily implied or incidental thereto. Among such duties, he shall:...(a) appoint, except as may otherwise be provided in this Charter or the Administrative Code, all department heads and appointive executive officers of the County government, subject to the approval of the County Legislature." Orange County Charter art III, § 3.02(a).

According to the Orange County Charter, County Executive Rampe had the authority to appoint the Commissioners and Department Heads in Orange County, subject to approval by the Legislature. However, according to his deposition testimony, he was permitted to make administrative and personnel decisions without review by the anyone. (Rampe Dep. at 6.) Rampe also set the length of term of county contracts without review. (Id.)

▮ In light of the fact that Rampe was the final policymaker of Orange County with regard to contracting, and because there is a question of fact concerning

Rampe's role, if any, in the firings, *see Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 926, the liability of Orange County will be submitted to the jury as well.

### 2. *Defendants Motion for Summary Judgment of the New York Whistleblower Claim*

Defendants' motion for summary judgment as to the claim under the Whistleblower Statute, Labor Law Labor Law § 740 is granted.

■ In order to establish a violation of Labor Law § 740, a plaintiff must prove (a) that the activity, policy, or practice that she objected to, refused to participate in, disclosed, or threatened to disclose was an activity, policy, or practice of the employer; (b) that the activity, policy, or practice constituted an actual violation of a law, rule or regulation, and (c) that the violation was one that creates and presents a substantial and specific danger to the public health or safety. *See Radice v. Elderplan*, 217 A.D.2d 690, 691, 630 N.Y.S.2d 326 (1995) (citations omitted).

■ The failure of DMH to verify patients' medication history, and its neglect in providing emergency psychiatric care for inmates was a violation of law, *see Radice*, 217 A.D.2d at 691, 630 N.Y.S.2d 326; *Merriweather v. Sherwood*, 518 F.Supp. 355 (S.D.N.Y.1981) (Consent Judgment) (outlining requirements for provision of mental health services in the Orange County system), and such neglect created and presented a danger to the life and safety of inmates under the care of DMH and EHG.

■ The only remaining question is whether plaintiffs were objecting to a practice of their *employer*, as opposed to that of a third party. In *Radice*, the plaintiff alleged that the defendant wrongfully terminated her employment as a nurse discharge planner because she reported the abuse of an elderly patient by a personal care worker/home aide employed by a third party. 217 A.D.2d at 690, 630

N.Y.S.2d 326. The Appellate Division dismissed the claim because the reported activity was not an activity of the defendant or of any of its employees. *See id.* at 691, 630 N.Y.S.2d 326. Rather, it was the act of a personal care worker employed by a third party who was not a party to the action. *See id.*

In the present case, plaintiffs were employed by EHG, a private entity, and not by the County. (Compl. at ¶ 13.) Moreover, plaintiffs claim that they were terminated for speaking out about the operation of DMH, not for any criticism of EHG. Because DMH was not the plaintiffs' employer, they cannot assert a claim under Section 740. Accordingly, defendants' motion for summary judgment is granted.

### 3. *Sanctions and Attorneys Fees*

Defendant EHG seeks attorneys fees and sanctions as the prevailing party in this court's decision to dismiss Menon's claims against it. For the reasons set forth below, EHG's motion for sanctions and attorneys fees is denied.

#### a. *Attorneys Fees*

■ In order to award attorneys' fees to a prevailing defendant under § 1988, a district court must find that "the plaintiff's action was frivolous, unreasonable, or without justification, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). In *American Federation of State, County and Municipal Employees, AFL—CIO (AFSCME) v. County of Nassau*, 96 F.3d 644 (2d Cir.1996), the Second Circuit reviewed a number of its prior decisions in which the plaintiffs' claims were found to have met the *Christiansburg* standard:

> We have indicated in particular cases what is meant by 'frivolous, unreasonable, or without foundation.' In *Gerena–Valentin v. Koch*, 739 F.2d 755, 756–57 (2d Cir.1984), the plaintiff claimed

that two municipal employees conspired to keep him off the ballot in an election for New York City councilman, in violation of the Voting Rights Act, § 42 U.S.C.1973 *et seq* . . . . [W]e approved a fee award to the prevailing defendants because the plaintiff had already litigated the issue (unsuccessfully) in state court, and because 'at no time . . . did [the plaintiff] attempt to produce any evidence whatsoever in support of his retaliation and conspiracy claim.' *Id.* at 761. In *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 246 (2d Cir.1985), a general contractor charged the City of New York and others with violating the antitrust and civil rights laws by prohibiting it from contracting with other companies 'engaged in City-financed reconstruction projects.' . . . [W]e approved a fee award to the defendant because the plaintiff 'could not point to a deprivation of any single right conferred by federal law or the . . . Constitution,' and had unsuccessfully challenged the City's action in state court. *Id.* at 252. And in *Faraci v. Hickey–Freeman Co.*, 607 F.2d 1025, 1027–29 (2d Cir.1979), we approved a fee award against a Title VII plaintiff where the evidence of non-discrimination was 'uncontradicted.'

*AFSCME*, 96 F.3d at 650–51 (2d Cir.1996).

■■■ This court does not find that plaintiff Menon's suit was frivolous, unreasonable, or without any justification. Menon sought to be a party to the § 1983 suit against EHG, despite having signed a re-

lease that precluded her from participating in such a lawsuit. Nonetheless this court dismissed her cause of action against EHG because she had negotiated the release, was represented by a lawyer, and accordingly understood that this would bar her from participating in a lawsuit against EHG. I therefore concluded that the totality of the circumstances suggested that Menon had signed a valid release. But this does not mean that her claim was unreasonable or without foundation. *See Le-Blanc–Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir.1998) (citing *Christiansburg*, 434 U.S. at 421–22, 98 S.Ct. 694). In general, the fact that a plaintiff ultimately loses the case is not in itself sufficient justification for the assessment of fees in favor of the defendant. *See id.*

Menon claimed that she was coerced into signing the release; that the release was supported by inadequate consideration because she was entitled to severance pay with or without the release; and that there was an industry-wide practice that entitled her to severance benefits. (*See* Trans. at 4.) She further claimed that she was owed $2,400 in accrued paid time-off benefits, and that signing the release was necessary for her to receive it. (Id. at 11.) The facts of this case do not, therefore, support an award of fees under the *Christiansburg* standard.

b. *Sanctions*

EHG also moves for sanctions under Rule 11 of the Federal Rules of Civil Procedure [1] on the grounds that plaintiff Me-

---

1. Rule 11 provides in pertinent part:

(b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of that person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

non knew or should reasonably have known that the claims she brought against EHG were barred by the general release that she had signed.

■■■■■ Rule 11 "is targeted at situations 'where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.'" *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1005 (2d Cir.) (quoting *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985)), *cert denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). When divining "the point at which an argument turns from merely 'losing' to losing and sanctionable," *Motown Productions, Inc. v. Cacomm, Inc.,* 849 F.2d 781, 785 (2d Cir.1988), we have instructed district courts to "'resolve all doubts in favor of the signer.'" *Id.* (quoting *Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986)), *cert denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); *Rounseville v. Zahl,* 13 F.3d 625, 633 (2d Cir.1994) (holding a district court's imposition of sanctions to be an abuse of discretion) (citing *Rodick v. City of Schenectady,* 1 F.3d 1341, 1350 (2d Cir.1993)). In *Rounseville,* the Court of Appeals determined that, at the time plaintiff's counsel filed the Complaint, the "available circumstantial evidence" could reasonably support the inferences contained in the Complaint. *See id.* (explaining that it was not sanctionable to sue a defendant with absolute immunity under section 1983 because he could have been involved in a conspiracy).

■■■ Menon's claim against EHG was a losing one, but it is not sanctionable. *See Motown Productions,* 849 F.2d at 785. Construing any doubts in favor of Menon, *see id.,* it seems clear that there was at least some circumstantial evidence to support her claim against EHG. She had been employed in correctional medical services for more than ten years, and understood that granting two months severance pay was common practice. She also was concerned about receiving $2,400 of accrued benefits owed to her by her employer. However, as explained above, Menon willingly signed away her rights to sue EHG in the release, and received severance pay as a condition of doing so. While I dismissed the claim, it was not so frivolous for me to impose sanctions now.

Accordingly, defendant's motion for sanctions and fees is denied.

This constitutes the decision and order of this Court.